[Cite as *State v. Ward*, 2026-Ohio-2973.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF LORAIN | ) | |

| STATE OF OHIO | C.A. No. 25CA012267 |
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| JOSEPH WARD | COURT OF COMMON PLEAS COUNTY OF LORAIN, OHIO |
| Appellant | CASE No. 23CR109270 |

DECISION AND JOURNAL ENTRY

Dated: August 3, 2026

HENSAL, Presiding Judge.

{¶1} Joseph Ward appeals from the judgment of the Lorain County Court of Common Pleas. This Court affirms.

I.

{¶2} This appeal stems from a horrific attack during which Mr. Ward killed his grandfather. Mr. Ward, who lived with his grandparents, became agitated due to a series of events that unfolded late one evening. He attacked his grandmother with a gun, using it to strike the side of her head. He later attacked his grandfather with the gun, allowing the grandmother to escape and flee to a neighbor's residence. Mr. Ward held his grandfather at gun point, used the gun to beat him, and threatened him over the course of ten minutes. When he tried to shoot his grandfather and the gun dry fired, he grabbed a nearby shovel and used it to beat his grandfather to death. Following the attack, Mr. Ward hid from the police and fled the scene on foot. He was apprehended several hours later in a nearby apartment building.

{¶3} A jury found Mr. Ward guilty of two counts of aggravated murder, murder, three counts of felony murder, two counts of kidnapping, three counts of felonious assault, two counts of having a weapon under disability, tampering with evidence, two counts of domestic violence, violating a protection order, criminal damaging, and multiple firearm specifications. The trial court sentenced him to life in prison without parole plus 37-41 years.

{¶4} Mr. Ward now appeals from his convictions, raising three assignments of error for review.

II.

ASSIGNMENT OF ERROR I

THE TRIAL COURT ERRED AND VIOLATED APPELLANT'S CONSTITUTIONAL RIGHTS TO DUE PROCESS AND A FAIR TRIAL BY REFUSING TO INSTRUCT THE JURY ON THE LESSER INCLUDED OFFENSE OF VOLUNTARY MANSLAUGHTER, WHERE THE EVIDENCE REASONABLY SUPPORTED SUCH AN INSTRUCTION.

{¶5} In his first assignment of error, Mr. Ward argues the trial court erred when it refused to instruct the jury on voluntary manslaughter. We disagree.

{¶6} "[A] trial court must fully and completely give the jury all instructions which are relevant and necessary for the jury to weigh the evidence and discharge its duty as the fact finder." *State v. Comen*, 50 Ohio St.3d 206 (1990), paragraph two of the syllabus. "Requested jury instructions should ordinarily be given if they are correct statements of law, if they are applicable to the facts in the case, and if reasonable minds might reach the conclusion sought by the requested instruction." *State v. Adams*, 2015-Ohio-3954, ¶ 240. "This Court reviews a trial court's decision to give or decline to give a particular jury instruction for an abuse of discretion under the facts and circumstances of the case." *State v. Sanders*, 2009-Ohio-5537, ¶ 45 (9th Dist.). The abuse of discretion standard implies that a trial court acted unreasonably, arbitrarily, or unconscionably.

*Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). When applying an abuse of discretion standard, a reviewing court is precluded from simply substituting its own judgment for that of the trial court. *Pons v. Ohio State Med. Bd.*, 66 Ohio St.3d 619, 621 (1993).

{¶7} Voluntary manslaughter is an offense of inferior degree to both aggravated murder and murder. *State v. Knuff*, 2024-Ohio-902, ¶ 183; *State v. Shane*, 63 Ohio St.3d 630, 632 (1992).

> Whether a voluntary-manslaughter instruction should be given requires consideration of both an objective and a subjective factor. *State v. Thompson*, 2014-Ohio-4751, ¶ 153. The objective factor requires determining whether a serious provocation occurred and whether that provocation was "sufficient to arouse the passions of an ordinary person beyond the power of his or her control." *State v. Shane*, 63 Ohio St.3d 630, 635 (1992). And the subjective factor requires evaluating whether "this actor, in this particular case, actually was under the influence of sudden passion or in a sudden fit of rage." *Id.* at 634.

*Knuff* at ¶ 184. "Fear alone is insufficient to demonstrate the kind of emotional state necessary to constitute sudden passion or fit of rage." *State v. Mack*, 82 Ohio St.3d 198, 201 (1998). Moreover, "[a] trial court need not give a voluntary manslaughter instruction if the evidence shows that a defendant had sufficient time to 'cool down' after being provoked." *State v. Little*, 2011-Ohio-768, ¶ 27 (9th Dist.), quoting *State v. Huertas*, 51 Ohio St.3d 22, 32 (1990).

{¶8} We begin by summarizing the evidence produced at trial. In addition to witness testimony, the State introduced surveillance footage taken from a security system Mr. Ward's grandparents had installed in their home. The system captured events that transpired (1) in the front yard, including the driveway and street; (2) in the main living room area, including part of the kitchen, a hallway, and a door to a converted garage area; and (3) on the backyard patio.

{¶9} The evidence showed that Mr. Ward lived with his grandparents, who had legal custody of him and his siblings from a young age. On the evening in question, Mr. Ward, his sister, and a small group of their friends met outside the grandparents' house. The group had two cars, which they parked in the street. Members of the group alternated between sitting in the cars,

standing outside them, and dancing in front of them. At 10:39 p.m., the grandmother emerged from the house and confronted the group. Several members of the group were African American, and the grandmother used a racial slur when instructing them to leave. Mr. Ward, who was seated in one of the cars, left with the group after the grandmother confronted them.

{¶10} The evidence showed that Mr. Ward returned home at 10:52 p.m. and attempted to enter the front door. The grandfather, who was seated just inside the front door, stood up and opened the door for him. Mr. Ward did not speak to his grandfather. Instead, he came inside and walked directly to another door off the kitchen. There was testimony that the door led to an attached garage, which the grandparents had converted to a second living room. From there, Mr. Ward proceeded to the backyard patio. Surveillance footage from 10:57 p.m. and 10:58 p.m. showed him standing on the patio having a phone conversation with his girlfriend, who he had placed on speakerphone.

{¶11} By 11:03 p.m., Mr. Ward moved to the street outside his grandparents' house. He continued to talk on the phone and appeared agitated as he paced the street. He eventually walked down the street and out of view of the surveillance camera. Evidence showed that he walked to the home of his girlfriend, who lived a few streets away, and broke a window at her home. He then returned to his grandparents' home. Surveillance footage captured him entering the house through the front door at 11:15 p.m.

{¶12} The evidence showed that, as soon as Mr. Ward entered the house, he walked directly to the door leading to the converted, second living room. He opened the door, stepped inside, and slammed the door behind him. Because there were no surveillance cameras in the second living room, there was no footage of the events that transpired inside it. Nevertheless, there

was evidence that the grandmother was inside the room when Mr. Ward entered it, and the two argued.

{¶13} The grandmother testified that Mr. Ward had a gun when he approached her. She did not fully recall their exchange but testified that he ultimately swung his gun and used it to hit her on the side of her head. After striking his grandmother, Mr. Ward came back out into the living room and approached his grandfather. At the time, the grandfather was still seated near the front door. Surveillance footage showed Mr. Ward repeatedly yelling at his grandfather and aggressively coming within inches of his face as his grandfather stood and began walking toward the second living room. When the grandfather moved ahead of Mr. Ward, Mr. Ward raised his gun and held it to the back of his grandfather's head as they walked. They entered the second living room at 11:18 p.m.

{¶14} Mr. Ward and his grandmother gave separate accounts of the events that transpired after he and his grandfather entered the second living room. According to the grandmother, she did not see the grandfather do anything to Mr. Ward before Mr. Ward began striking him with the gun. She said she was able to leave the room and flee to a neighbor's residence while Mr. Ward focused on the grandfather. Surveillance footage showed her running outside at 11:19 p.m.

{¶15} According to Mr. Ward, when he and his grandfather entered the second living room, his grandmother was on the floor trying to retrieve something. He testified that he walked over to help her, but his grandfather kept asking what had happened. Mr. Ward testified that he walked back to his grandfather, and his grandfather shoved him. Mr. Ward then fell backwards and dropped his gun. It was his testimony that his grandfather stood over him and tried to pick up the gun. Mr. Ward testified that he felt afraid and thought his grandfather might use the gun on him or his grandmother, so he hit his grandfather. When asked to clarify how he had felt at that

moment, Mr. Ward responded that he had felt afraid. When asked if he had experienced any other feelings, he said he had felt angry.

{¶16} Surveillance footage captured Mr. Ward coming back through the door into the main living room at 11:19 p.m. The grandfather walked into the room directly behind him, and Mr. Ward quickly turned toward his grandfather with the gun in his hand. Mr. Ward pointed the gun at his grandfather before shoving him and threatening to shoot him in the head. The shove caused the grandfather to stumble forward and catch himself on a table. Mr. Ward continued to yell at the grandfather, commanding him to move to a certain place or get shot in the head. He then used the gun to strike his grandfather, causing him to fall to the floor. After the grandfather fell, Mr. Ward briefly walked away before returning and commanding the grandfather to move. The grandfather refused to do so and yelled for the grandmother, saying that he could not get up. Mr. Ward proceeded to swing the gun and used it to strike his grandfather four times.

{¶17} The evidence showed that Mr. Ward continued to threaten his grandfather but allowed him to get up and walk down a hallway off the living room. The grandfather repeatedly indicated that he needed a towel for his head wounds because they were bleeding and he could not see. Mr. Ward shoved his grandfather several times as they moved toward and down the hallway but stopped to open a closet, get a towel, and give it to his grandfather. As the grandfather told Mr. Ward that he was in trouble and to look at what he had done, Mr. Ward forced his grandfather back through the door to the second living room at gunpoint.

{¶18} Mr. Ward brought his grandfather outside to the backyard patio at 11:24 p.m. He continuously threatened his grandfather while pointing the gun at him. At one point, the grandfather attempted to flee, but Mr. Ward quickly stopped him and forced him back down into a chair. Mr. Ward eventually tried shooting his grandfather twice, but the gun dry fired both times.

After his attempts to shoot failed, he walked to another area of the porch, retrieved a shovel, and used it to beat his grandfather. He struck his grandfather's head with the shovel a total of six times. He then used his gun to hit his grandfather before he tried once more to shoot him. Following the attack, Mr. Ward dragged his grandfather's body back inside the second living room.

{¶19} Mr. Ward requested a jury instruction on voluntary manslaughter, but the trial court denied his request. The court found that, even viewing the evidence in a light most favorable to Mr. Ward, there was insufficient evidence of serious provocation. It also found that the length of the attack detracted from the conclusion that Mr. Ward had experienced a "sudden" fit of rage. The court explained:

> I don't think it was sudden. I find that it's not sudden, given the time lapse involved. And that the response was not, even, once again, considering the Defendant's testimony position, it was not reasonable that a shove and an attempt to take a gun that was being used to beat the decedent's wife, it's not a reasonable response to have engaged in the activities alleged here.

Thus, the court refused to instruct the jury on voluntary manslaughter.

{¶20} Mr. Ward takes issue with the court's ruling in several respects. He claims his grandfather's actions in shoving him and attempting to seize his gun created an objectively reasonable threat that amounted to adequate provocation. He also claims the trial court erred when it found that the attack was not sudden due to the time lapse involved. According to Mr. Ward, the court improperly focused on the total time that elapsed between the racial slur his grandmother used on his friends and the attack on his grandfather. He argues that the only length of time that mattered was the time between when his grandfather provoked him and when he responded by attacking him. He argues that, once his grandfather provoked him, the attack that occurred was immediate and continuous such that there was no lapse of time or opportunity for a cooling off period. According to Mr. Ward, the evidence showed that he acted "under extreme emotional

disturbance" as he had gone several days without sleep, had high stress levels, and had fought with his girlfriend. Because there was evidence to support a charge of voluntary manslaughter, Mr. Ward argues, the trial court erred by refusing his request for that jury instruction.

{¶21} Having carefully reviewed the record and the facts and circumstances presented herein, we cannot conclude the trial abused its discretion when it refused to instruct the jury on voluntary manslaughter. *See Sanders*, 2009-Ohio-5537, at ¶ 45 (9th Dist.). Even assuming a shove from an elderly man could constitute adequate provocation, Mr. Ward testified that he initially hit his grandfather because he was afraid his grandfather might gain control of the gun and use it on him or his grandmother. As previously noted, fear "is insufficient to demonstrate the kind of emotional state necessary to constitute sudden passion or fit of rage." *Mack*, 82 Ohio St.3d at 201. *See also State v. Thomas*, 2015-Ohio-2935, ¶ 29 (9th Dist.) (involuntary manslaughter instruction not warranted where victim testified that he shot the victim because he was angry and afraid the victim would regain control of the gun and shoot him). Further, the record reflects that Mr. Ward had multiple opportunities to "'cool down' after the alleged provocation." *State v. Hunter*, 2018-Ohio-568, ¶ 14 (9th Dist.), quoting *Little*, 2011-Ohio-768, at ¶ 27 (9th Dist.). Mr. Ward held his grandfather at gunpoint, pursued him, and attacked him over the course of ten minutes. He could have stopped the attack at any point, including when his grandfather fell several times, when he walked down the hallway, when he attempted to flee on the backyard patio, and when the gun misfired. Rather than do so, Mr. Ward continued his threats, continued his pursuits, and used an alternative weapon to kill his grandfather through a series of fatal blows. "The Ohio Supreme Court has recognized multiple shots or stabs as indicative of purpose to kill." *State v. Williams*, 2009-Ohio-3162, ¶ 22 (9th Dist.). The evidence presented at trial "tends to prove [Mr. Ward's] purpose to kill [his grandfather] rather than that his will was reasonably overborne by sudden rage

due to any provocation of the victim." *Id.* Accordingly, we cannot conclude the trial court erred when it refused to instruct the jury on voluntary manslaughter. Mr. Ward's first assignment of error is overruled.

ASSIGNMENT OF ERROR II

THE TRIAL COURT VIOLATED APPELLANT'S CONSTITUTIONAL RIGHTS BY IMPOSING AN EXCESSIVE SENTENCE BASED ON IMPROPER CONSIDERATION OF APPELLANT'S EXERCISE OF HIS CONSTITUTIONAL RIGHT TO REMAIN SILENT AND HIS PERCEIVED LACK OF REMORSE.

{¶22} In his second assignment of error, Mr. Ward argues that the trial court violated his constitutional rights when it focused on his alleged lack of remorse as an aggravating factor in its sentencing decision. He also argues that his sentence was not supported by statutory factors, and thus, was excessive. For the following reasons, we reject his argument.

{¶23} Revised Code Section 2953.08 governs appeals based on felony sentencing guidelines. It specifically provides that "[a] sentence imposed for aggravated murder or murder pursuant to sections 2929.02 to 2929.06 of the Revised Code is not subject to review under this section." R.C. 2953.08(D)(3). The Supreme Court has held that the statute "does not preclude an appeal of a sentence for aggravated murder or murder that is based on constitutional grounds." *State v. Patrick*, 2020-Ohio-6803, ¶ 22. Nevertheless, nonconstitutional sentencing arguments remain unreviewable pursuant to the statute. *See, e.g., State v. Diamond*, 2024-Ohio-195, ¶ 7 (9th Dist.); *State v. Ramsay*, 2021-Ohio-2870, ¶ 15 (9th Dist.).

{¶24} Mr. Ward's argument consists of two separate components: a constitutional claim and a statutory claim. To the extent he attempts to challenge the trial court's application of statutory factors, his sentence is not reviewable. *See Diamond* at ¶ 7. Accordingly, we limit our review to his constitutional claim.

{¶25}  Mr. Ward essentially argues that (1) he had a Fifth Amendment right to remain silent, and (2) by stressing his failure to verbally express his remorse at trial or sentencing, the trial court violated his constitutional right to remain silent.  We would note that, while Mr. Ward frames his argument as a constitutional one, a defendant's lack of remorse is a statutory sentencing factor a trial court must consider under Section 2929.12(D)(5).  Mr. Ward has not addressed the State's argument that his entire assignment of error is not reviewable under Section 2953.08(D)(3) because it sounds in statutory law rather than constitutional law.  *See Patrick* at ¶ 22.  *See also State v. Brunson*, 2022-Ohio-4299, ¶ 70.  Even assuming he has properly presented us with a constitutional argument, however, we nevertheless reject it.

{¶26}  The record reflects that Mr. Ward never objected or otherwise raised his constitutional argument in the lower court.  In *Brunson*, the Ohio Supreme Court found that a defendant raising a similar constitutional argument had forfeited it by failing to raise it at trial.  *See Brunson* at ¶ 67.  Even if Mr. Ward did not forfeit his argument, however, the record reflects that he did not invoke his right to remain silent at trial.  He testified in his own defense.  He also took advantage of his right of allocution at sentencing.  The trial court found that he lacked remorse based on his own statements and the fact that he "was laughing" when the State played one of his jail calls at sentencing.  During that call, Mr. Ward stated that he had a plan to hire a prostitute, have her pass him drugs in a balloon by kissing him, and then "sh*t them out and make money by bringing drugs into the institution."  Mr. Ward has not explained how the trial court violated his right to remain silent, given that he did not invoke it.  Accordingly, his second assignment of error is overruled.

ASSIGNMENT OF ERROR III

THE TRIAL COURT'S SENTENCE OF LIFE IMPRISONMENT WITHOUT
THE POSSIBILITY OF PAROLE, IMPOSED ON A TWENTY-YEAR-OLD

DEFENDANT WITHOUT MEANINGFUL CONSIDERATION OF HIS YOUTH AND CAPACITY FOR REHABILITATION, CONSTITUTES CRUEL AND UNUSUAL PUNISHMENT IN VIOLATION OF THE EIGHTH AMENDMENT OF THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 9 OF THE OHIO CONSTITUTION.

{¶27} In his third assignment of error, Mr. Ward challenges his sentence on the basis that it violates the Eighth Amendment. He argues that the trial court failed to consider his youth as a factor in its sentencing decision. According to Mr. Ward, the length of his sentence amounts to cruel and unusual punishment and "is grossly disproportionate under the Eighth Amendment's individualized sentencing requirement." Upon review, we reject his argument.

{¶28} In *Miller v. Alabama*, the United States Supreme Court held that "mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.'" 567 U.S. 460, 465 (2012). The Ohio Supreme Court relied on that ruling in *State v. Long* wherein it held that "[a] court, in exercising its discretion under R.C. 2929.03(A), must separately consider the youth of a juvenile offender as a mitigating factor before imposing a sentence of life without parole." 2014-Ohio-849, paragraph one of the syllabus, citing *Miller*.

{¶29} Mr. Ward acknowledges that he was 20 years old at the time of his crimes, and thus, was not a juvenile offender. He nevertheless argues that "the neuroscience underlying *Miller* applies equally to young adults." According to Mr. Ward, *Long*

> extended *Miller's* principles, holding that trial courts must consider a defendant's youth and its attendant characteristics even when sentencing adult offenders to long terms of years.

> The *Long* court emphasized:

> "Although *Miller* addressed only juveniles, the underlying rationale, that certain characteristics of youth diminish culpability – applies with equal force to defendants in their late teens and early twenties." [*Long*] at ¶ 24.

Mr. Ward argues that the court failed to consider his youth and its impact on his culpability.

{¶30} We reject Mr. Ward's argument for two reasons. First, we question whether he adequately preserved his argument in the lower court. The trial court offered both parties the opportunity to file sentencing memoranda but only the State did so. In its memorandum, the State asked the trial court to impose a sentence of life without parole plus 58 to 63.5 years. Mr. Ward, therefore, was aware that the State intended to seek life without parole as well as an indeterminate prison term. At his sentencing hearing, Mr. Ward asked the court to impose the minimum sentence of 26 years to life in prison based on a number of factors. He did briefly note that he was only 20 years old when he committed his crimes. Yet, he did not set forth any argument about *Miller* or *Long*. Nor did he argue that the court had a constitutional obligation to consider his age at the time of his offense. Mr. Ward has raised his Eighth Amendment arguments for the first time on appeal. In general, this Court will not consider constitutional arguments for the first time on appeal save for a claim of plain error. *See State v. Franklin*, 2019-Ohio-1513, ¶ 33-36 (9th Dist.); *State v. Burgess*, 2008-Ohio-2025, ¶ 5-6 (9th Dist.). Mr. Ward has not argued plain error, and we are loath to construct an argument on his behalf. *See Fleckenstein*, 2023-Ohio-4347, at ¶ 10 (9th Dist.).

{¶31} Second, even assuming Mr. Ward did not forfeit his constitutional argument, he has not established error on appeal. The defendant in *Long* was 17 years old at the time of his crimes. *Long*, 2014-Ohio-849, at ¶ 2. Upon careful review of *Long*, this Court is unable to find any indication that the Supreme Court intended its decision to apply to offenders over the age of 18. The decision is limited to minors and does not reference young adults. Nor does it contain the quote Mr. Ward has attributed to it. Indeed, a search for that quote reveals that it does not appear in any reported decision. Mr. Ward has failed to set forth any authority for his position that a court must consider youth as a factor before sentencing a 20-year-old to life without parole. *See* App.R. 16(A)(7). Accordingly, we reject that portion of his argument.

**{¶32}** Mr. Ward also argues that his sentence "is grossly disproportionate under the Eighth Amendment's individualized sentencing requirement." It is unclear whether he believes his sentence is grossly disproportionate to his crimes or to sentences imposed on other similarly situated offenders. His analysis on this point consists of a single hypothetical question: "If an 18-year-old cannot receive life without parole for rape (because of capacity for change), why should a 20-year-old receive it for an impulsive, non-premediated killing triggered by provocation and extreme emotional disturbance?"

**{¶33}** This Court has already determined that the evidence presented at trial tended to prove that Mr. Ward engaged in an intentional act rather than one triggered by provocation. *See* Discussion of Assignment of Error I, *supra*. Further, Mr. Ward has provided no law, other authority, or analysis for his argument that his sentence is grossly disproportionate. "An appellant bears the burden of affirmatively demonstrating the error on appeal[] and substantiating his or her arguments in support." *State v. Arnoff*, 2020-Ohio-3520, ¶ 12 (9th Dist.), quoting *Ohio Edison Co. v. Williams*, 2007-Ohio-5028, ¶ 10 (9th Dist.). This Court will not construct an argument and perform an analysis on Mr. Ward's behalf. Accordingly, his third assignment of error is overruled.

III.

**{¶34}** Mr. Ward's assignments of error are overruled. The judgment of the Lorain County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

---

JENNIFER HENSAL
FOR THE COURT

STEVENSON, J.
SUTTON, J.
CONCUR.

APPEARANCES:

DENISE G. WILMS, Attorney at Law, for Appellant.

ANTHONY D. CILLO, Prosecuting Attorney, and MATTHEW A. KERN, Assistant Prosecuting Attorney, for Appellee.